# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## ATWOOD v. SHENANDOAH V. R. R. CO.

### April 11th, 1889.

1. RAILROAD COMPANIES—*Bonds — Mortgages — Case at bar.*—Under its charter and the circumstances of this case;

HELD:

> The Shenandoah Valley Railroad Company was authorized to issue the $1,560,000 of bonds under the first mortgage ; in placing the said bonds as security for the general mortgage bonds, the company violated no rights of the first mortgage bondholders ; as to the said $1,560,000 of bonds, both sets of bondholders stand upon the same footing ; there was no over-issue of bonds ; the failure of the trustee to certify the last-mentioned bonds as directed, affects not their validity; the principles controlling fiduciary relations have no application ; the transaction was merely a lending of money on one side and a borrowing on the other.

2. IDEM—*Charter from several States—Separate corporations.*—Railroad through several States and incorporated in each, is a separate corporation in each, and governed by the laws of each within the respective jurisdictions.

3. POWERS—*Performance—Equity.*—Execution of a *mere* power in donee cannot be compelled, but equity will aid a defective execution. Power coupled with a trust, is imperative and must be executed. Want of a trustee cannot avoid a trust, nor can any act or omission of the trustee.

4. EQUITABLE JURISDICTION AND RELIEF— *Trustees— Performance of duty.*—Equity will either compel trustee to perform his duty, or disregard its omission under the canon that " equity considers that done which in good conscience ought to be done."

5. CHANCERY PRACTICE—*Supplemental bills—Newly discovered evidence.*— Where supplemental bill seeks no discovery, alleges no new matter, and tenders no new issue, leave should not be given to file it. If after commission closed, new evidence is discovered as to facts stated in original bill, the court should be applied to for leave to examine new witness.

6. IDEM—*Depositions—Case at bar.*—In this case it was no error for commissioner to proceed further in taking depositions of witnesses whose depositions had been completed, without leave of court.
7. IDEM—*Commissioner's report—Exceptions.*—Either party to the suit may take testimony after the commissioner has made up and returned his report, which may be always excepted to on the ground that a valid debt has been reported invalid or *vice versa.*

Appeal from decrees of circuit court of Roanoke city, rendered December 24th, 1887, and April 24th, 1888, respectively, in the chancery cause wherein Charles G. Atwood and others were complainants, and are the appellants here, and the Shenandoah Railroad Company and others were defendants. The company was incorporated in this State, and given general powers to build a railroad. Subsequently similar powers were given it by West Virginia and Maryland. Different mortgages were executed by the company to secure various bonds, the Fidelity Insurance, Trust and Safe Deposit Company being trustee, and default being made in payment of the bonds, the trustee and others brought a bill to foreclose. A receiver was appointed and the cause referred to a master, who made his report. The court decided that the bondholders under the general mortgage were entitled to share in the security of the first mortgage to the extent of $1,560,000, the amount of the first mortgage bonds deposited with the trustee as collateral security for the payment of the general mortgage bonds, and December 24th, 1887, decreed a foreclosure, etc. Various bondholders became parties by petition. The first mortgage bondholders obtained an appeal and *supersedeas.* Opinion states the case.

*Joseph Leedam, Charles L. Lamberton,* and *W. W. & B. T. Crump,* for the appellants.

*Wm. J. Robertson,* and *John C. Bullitt,* for the trustee—appellee.

*Camm Patteson, Williams & Boulware,* and *W. R. Staples,* for the general mortgage bondholders—appellees.

*W. H. Travers,* for the Shenandoah Valley R. R. Co.

RICHARDSON, J., delivered the opinion of the court.

This is a case of far more than ordinary importance; and in the investigation of the complicated questions involved, this court has been favored with elaborate arguments, written and oral, of eminent counsel, at home and from abroad, in which the claims of the respective contestants have all been discussed with consummate skill and ability.

In this opinion we have no concern with the questions decided by the court below in its decree of April, 1888, as those questions will be treated and decided in separate opinions; we are, there-fore, restricted in this opinion to the consideration of the questions decided in the decree of the court below of December 24th, 1887, by which the fifteen hundred and sixty first-mortgage bonds, here in controversy, were declared to be valid outstanding obligations of the Shenandoah Valley Railroad Company, issued under and in pursuance of the terms of said company's first mortgage of April 1st, 1880, and properly delivered to and now held by the Fidelity Insurance, Trust and Safe Deposit Company, as trustee in said company's general mortgage of April 5th, 1881, as collateral security for the bonds issued under and in pursuance of the terms of said general mortgage and now so held by the appellees, the general mortgage bondholders. But before proceeding to consider this question, we must first dispose of two preliminary questions of practice.

I. It is objected that the circuit court erred in refusing to permit the appellants, the first mortgage bondholders, to file their supplemental bill; which bill was for the first time tendered, and leave asked to file it, at the term in which the decree

complained of was rendered, and just as the argument in the cause was about to commence. From the facts and circumstances disclosed by the record, we are clearly of opinion that the objection is without merit.

The order of account made in the cause on the 11th of May, 1885, was for the express purpose, as shown on its face, of clearly ascertaining the rights of the respective classes of the creditors of the Shenandoah Valley Railroad Company "to satisfaction out of its property and effects, and the amount due or to become due to said classes respectively." Hence the master was directed to take, among others, an account "of the amounts due or hereafter to become due under the respective trust deeds or mortgages which have been made by said" Shenandoah Valley Railroad Company, "and which have not been relieved or satisfied, showing the relative rights and priorities and the property included in or conveyed by said deeds respectively."

The taking of testimony under this order was commenced on the 26th of February, 1886, and was continued from time to time until the 12th of March, 1887, the counsel for appellants (first mortgage bondholders) being present and participating on each occasion in the examination of witnesses and introducing witnesses on behalf of their clients. And, as already stated, in the progress of taking this testimony, counsel for the first mortgage bondholders, the appellants, applied to the trustee company, the sole plaintiff in the suit, to be formally recognized of record as counsel by it as trustee, and to be permitted to appear in the trustee's name, in order to protect the interests of their clients, the first mortgage bondholders. The request was very properly refused, and for the obvious reasons—first, that it involved the surrender in part, at least, of the plain right and duty of the trustee company, a common trustee in both the first and general mortgages, to conduct the suit for the protection of the interests of all parties secured by both mortgages; and, second, because to grant the request would be in effect to displace its own counsel, which it had no occasion for doing; at the same time, how-

ever, expressing the opinion that doubtless the court would recognize the counsel of individual bondholders should they appear and so desire.

Afterwards, at the December term, 1886, the appellants (first mortgage bondholders), upon their petitions to be admitted as parties plaintiff, they were allowed to file them, and the original plaintiff, the Fidelity Insurance, Trust and Safe Deposit Company, was given until the 15th of January, 1887, to answer the same. And at the same term leave was given Lewis C. Clark, a general mortgage bondholder, to file his petition asking to be admitted as a party defendant; and leave was given the Fidelity Insurance, Trust and Safe Deposit Company and the said petitioning first mortgage bondholders to answer it. This action on the part of Lewis C. Clark, it is clear, was induced by the action of said first mortgage bondholders; for in his petition, .which was presented on his own behalf and on behalf of the other general mortgage bondholders, he says that he had not previously applied to be made a technical party to the suit, because he, in common with the other bondholders of his class, and also the first mortgage bondholders, had been represented by counsel, with the assent of the plaintiff, the Fidelity Insurance, Trust and Safe Deposit Company, in the proceedings in the suit; but that, inasmuch as sundry first mortgage bondholders had filed their petitions to be made parties plaintiff to protect their interests, which were in conflict with the interests of the general mortgage bondholders, it was manifestly proper that, if they should be admitted as parties plaintiff, he, on his own behalf and on behalf of the other general mortgage bondholders, should be admitted as defendant; and, in his petition stating that the fifteen hundred and sixty bonds were then uncertified by the trustee, asked that it should be required to certify them and deliver them to the general mortgage bondholders.

In their answers to this petition of Lewis C. Clark, a general mortgage bondholder, the first mortgage bondholders show that the ground, and the only ground, on which they based their

application to be admitted as parties plaintiff was their claim that the deposit of the fifteen hundred and sixty first mortgage bonds with the Fidelity Insurance, Trust and Safe Deposit Company, trustee, as security for the general mortgage bondholders, was unauthorized and illegal, and that the trustee company had, in its bill, taken a position in reference to said bonds adverse to the interest of the first mortgage bondholders; and they ask that the application of Lewis C. Clark that the trustee of the first mortgage be required to sign, certify and deliver these fifteen hundred and sixty bonds to the general mortgage bondholders be stricken out as irrelevant and impertinent; and then add "that the question as to the validity of these bonds is one of the main issues in the cause, raised under the pleadings and testimony taken and passed upon by the master commissioner in his findings, who holds the said bonds to be invalid; all of which, at and before the filing of said petition, was well known to the solicitor of the petitioner."

When this answer was filed all the testimony in the cause was in, and the master (before part of that testimony was taken) had made up and submitted to counsel, as already stated, the rough draft of his report, in which these fifteen hundred and sixty bonds were held to be invalid; but the petitions filed as aforesaid to be admitted as parties plaintiff or defendant had not then been acted on, and were not acted on until the 26th day of July, 1887, when the petitioners were all admitted as parties plaintiff or defendant.

Thus it is seen that the first mortgage bondholders, relying on the report of the master, made up before all the evidence now in the record was taken, were disposed not only to spurn as irrelevant and impertinent the petitioning request of Lewis C. Clark, a general mortgage bondholder, that the trustee be required to certify and deliver the fifteen hundred and sixty bonds to the general mortgage bondholders, but they directly affirm that the validity of those bonds is a main question at

issue in the cause, and has been passed on by the master adversely to the general mortgage bondholders.

It is a doctrine too familiar to need the citation of authorities, that a party may always except to a commissioner's report upon the ground that a debt or claim which is invalid has been reported as valid, or that a valid claim has been reported as invalid. Indeed, it was upon the last-named ground that the general mortgage bondholders in this case excepted to the report of the master, and a question being thus properly raised under the pleadings and evidence in the cause, the circuit court, at the hearing, entertained and passed upon the question so presented, and rightfully presented, for its consideration and decision.

And we are bound to conclude that this was the view taken by the learned counsel for the first mortgage bondholders, or else, we apprehend, they would, at the July term, 1887, when they were first admitted as parties plaintiff of record, have asked to change their position from that of plaintiffs to defendants, and to be permitted to file a *cross-bill.* Nor did they, when so admitted as plaintiffs, even move to suppress any of the evidence in the cause, and it all was then in. The reason is obvious. They were then resting and relying upon the already made up report of the master in their favor, and chose to be quiet as to the after taken testimony then in the cause.

It is useless to enter into a discussion as to what is or what is not properly supplemental matter, or when and under what circumstances it is proper to allow a supplemental bill to be filed. For, be this as it may, and admitting for the sake of the argument that the appellants might have proceeded as well by a supplemental as by a cross-bill, it is quite clear that, as the supplemental bill sought no discovery, alleged no new matter, and tendered no issue not already made, the court was right in refusing leave to file it, as delay only would have been the result. Upon principle and authority it is clear that the issue was as

fully made up in respect to the validity of the fifteen hundred and sixty bonds, and as open to a full consideration and fair decision, as it could have been by a supplemental bill, or by a cross-bill, and that there was really no necessity for either. See *Moorman* v. *Smoot,* 28 Gratt. 87 ; *French* v. *Townes,* 10 Gratt. 513 ; *Faulkner* v. *Davis,* 18 Gratt. 652, and numerous other cases that might be cited.

In Story's Equity Pleadings the rule applicable to this case is briefly stated as follows: "If new evidence has been discovered since the commission was closed, as to the facts stated in the original bill, the proper course would be, not to file a supplemental bill, but to apply to the court for permission to examine the new witnesses." Ch. Pl. n. 1, citing *Knight* v. *Knight,* 4 Mad. 1.

Here, the supplemental bill is grounded solely upon the non-certification of the fifteen hundred and sixty bonds, a fact discovered in the course of taking evidence in the cause, and a discovery which seems to have been a surprise to all parties; but it was known to the appellants when they were admitted as parties plaintiff in July, 1887, and is set up in their petition to be made such parties. They did not then ask to suppress any evidence, and doubtless because they relied upon the then made up report of the master to outweigh the subsequently taken testimony. But the master, as he was in duty bound, returned *all* the evidence, and made a supplemental report, in which he did not content himself with simply referring to the after-taken testimony, but he reported the *facts thereby proved,* and they were of a most potential nature. Then, just on the eve of the hearing of the cause, the appellants tender their supplemental bill, and it being rejected, and properly rejected, they direct their attention to the after-taken evidence, and this is the subject next to be considered.

II. The second assignment of error is as to the propriety of the ruling of the court below in refusing to suppress the depositions of certain witnesses. The objection to the depositions of

all the witnesses, examined after the master had made up and submitted the rough draft of his report as aforesaid, is, that they were taken after the taking of testimony in the cause had been closed by the master and after he had made up his report and had submitted it to counsel. The objection to the depositions of part of the same witnesses is, that their depositions had previously been taken, completed and signed by them, and that their depositions were afterwards again taken without first obtaining the leave of the court to re-examine them, and that, therefore, they, as well as the others, should be suppressed. We are clearly of opinion that, under the peculiar circumstances of this case, the objection is not well taken.

The evidence alone in this case makes a printed volume of seven hundred and seventy-two pages, two-thirds of which is made up of extract copies from the book and papers of the Shenandoah Valley Railroad Company.

The witnesses whose depositions are sought to be suppressed are Clarence H. Clark, W. G. McDowell and G. R. W. Armes, who were or had been officials of this railroad company, and were supposed to be familiar with the conduct of its affairs, and John B. Gest, vice-president of the Fidelity Insurance, Trust and Safe Deposit Company. During the taking of the depositions in this cause before the master, three of these witnesses, to-wit: McDowell, Armes and Gest, were several times examined, they signing their depositions each time, and being re examined from time to time by the master as the facts were developed and their further testimony was needed. This doubtless resulted from the fact that it was impossible to tell, at any one time, what and how much of the railroad company's actings and doings, as evidenced by its books and papers, or was personally known to these witnesses, might be needed in evidence. It is, therefore, apparent that justice and the necessities of the situation fully warranted the course thus far pursued by the master.

The rule is, that a commissioner properly has much latitude of discretion in granting continuances of proceedings before

him; and the court whose order he is executing will not over-
rule his action in that respect, unless it be plainly erroneous.
Still less will an appellate court reverse a decree for that cause.
*Fant* v. *Miller & Mayhew*, 17 Gratt. 187. Under the circum-
stances above stated we think the action of the master in taking
and retaking the depositions of these witnesses was fairly within
the spirit of the rule above stated, and was not only authorized,
but demanded by the necessities and very right of the case.
Upon what principle, then, can it be contended that, though the
master had adjourned the taking of depositions *sine die*, and
had even made up his report, but had not returned it, as was
the case, he could not, for reasons satisfactory to him, and dic-
tated by a sense of duty and in aid of the justice of the case,
proceed to take further testimony? We know of no sufficient
reason why he might not do so, his conduct being subject always
to the controlling supervision of the court whose order he was
executing.

And such would seem to have been the view taken by the
master himself, for the record shows that, while the adjourn-
ment of the taking of evidence in the cause occurred on the 19th
of February, 1887, yet before the adjournment a commission
was regularly issued, after due notice to all parties, to Thomas
J. Hunt, commissioner, for the taking of depositions on behalf
of the general mortgage bondholders on the 15th of February,
1887, four days prior to said adjournment.

Moreover, the counsel for the first mortgage bondholders
claim that the taking of testimony before the master closed at a
day earlier than the 19th of February, 1887, though the adjourn-
ment of the master is of that date. The record shows that the
master had given notice for the taking of depositions before
him on the 12th of January, 1887, when no witnesses appearing,
the taking of depositions was continued until the 19th February,
1887, the date of the master's adjournment *sine die*. At the
appointment of January 12th, 1887, the counsel of the first
mortgage bondholders appeared before the master and entered a

protest in writing against the further taking of depositions, claiming that the taking of testimony had been duly and regularly closed on or about the preceding 16th day of December, 1886; and, among other things, said counsel propounded to the master, in writing, the following question: "Has, or has not, the testimony in the foreclosure proceedings before the master in this case been closed, and if so, when?" Answer. "The master replies that he considered that the testimony under the order of general reference of 11th of May, 1885, was closed on the 3d day of November, 1886; that since that time he has notified counsel in the cause that he would take and receive any testimony that they should see fit to offer, and return the same to the court, together with any exceptions that might be made thereto.

"Signed, ROBERT E. SCOTT, *Master.*"

Yet the master's adjournment is dated subsequently, to-wit: on the 19th of February, 1887, four days before which time depositions had actually been taken, before Commissioner Hunt, in the city of Philadelphia, under the commission sued out for the purpose as aforesaid, and the record shows that the master, Robert E. Scott, was present.

In thus proceeding, the commissioner violated no rule of law, practice, common sense, or propriety. Under such circumstances, it would indeed require an iron rule to induce a court of conscience to suppress these depositions.

It must be conceded that, as the law then stood, the general rule was that, without the leave of the court, a deposition once taken could not be retaken, but much latitude was always allowed in permitting a second examination. In *Fant* v. *Miller & Mayhew, supra,* Judge Moncure said, that when such leave had been granted by the circuit court, even though the court of appeals " differed from the circuit court in regard to the propriety of granting such leave, it could not afford just ground for reversing the decree; at least unless it was palpably improper to grant such leave, as the circuit court ought to possess much latitude of

discretion in the decision of such questions." There could be little excuse for holding in this case that the circuit court, had the leave been asked, should not have granted it. Nor is there, as has been shown, anything which rendered it necessary first to obtain from the court a special order authorizing the re-examination of these witnesses. The depositions were taken by the master under the order of the court, and in the due execution of that order, as to the commissioner seemed best under all the circumstances. In thus proceeding to execute the order, the master commissioner was but the hand of the court and was, in the nature of things, allowed much latitude of discretion; and while his action was subject to the control of, and liable to be rejected or corrected by the court, and would have been corrected, had the discretion allowed been abused, yet that was a matter resting in the sound discretion of the court, and to be exercised in the same manner that the court could correct its own direct acts and proceedings. The court below saw nothing to warrant it in disturbing the action of the master in this respect; and this court sees nothing to authorize it to interfere with what certainly seems to have been a proper exercise of discretion by that court.

But more has already been said on this subject than was actually necessary, as the question is settled by statute, nor would the subject have been so fully considered but for an evident misapprehension as to the authority vested in the master independently of the statute.

By our statute (Code 1873, ch. 172, § 36) it is provided that " in a suit in equity a deposition may be read, if returned before the hearing of the cause, or though after an interlocutory decree, if it be as to a matter not thereby adjudged, and be returned before a final decree."

Doubtless this provision was intended by the legislature to preclude the idea that the action of a commissioner, in making up and even returning his report, could have the effect of preventing the parties, or either of them, from taking further testimony. It may often happen that important evidence is dis-

covered after the return of the commissioner's report; or from sickness or other cause a party may not be able to take his testimony; cr a party may desire to offer mere cumulative evidence; in either of which cases justice demands that the evidence should be considered, unless some good reason to the contrary be shown.

III. We come now to consideration of the main question in the case, and that is as to the correctness of the decision of the circuit court awarding to the appellees, the general mortgage bondholders, the benefit of the fifteen hundred and sixty first-mortgage bonds deposited with the trustee of the general mortgage as collateral security for the general mortgage bonds.

The decision of the court below is assailed as erroneous on various grounds, and these, or such of them as it may be necessary to examine, will be considered as we proceed to state and apply to the facts the principles which govern the case and sustain the conclusion arrived at by the court.

The very full statement of the case, which has been made, renders it unnecessary to again state in detail the provisions contained in the legislative enactments of the States of Virginia, West Virginia, and Maryland, respectively, incorporating the Shenandoah Valley Railroad Company, and conferring upon it certain powers, rights and privileges, or the proceedings had and authorized by the stockholders and directors of said company in pursuance of its chartered rights; or of the voluminous facts and circumstances incident to the construction of the company's railroad, the execution by it of the two mortgages—one of April 1st, 1880, known as the first mortgage, and the other of April 5th, 1881, known as the general mortgage.

The first enquiry is, did the president and directors have the authority to issue these fifteen hundred and sixty bonds under the first mortgage? This question is readily answered by looking, first, to the act of incorporation which, in express terms, confers upon the company the right to borrow money for the purposes of the act of incorporation, "and to issue proper certificates of such loans, and to pledge the property of the com-

pany, by mortgage or otherwise, for the payment of the same, and the interest that may accrue thereon "; and, second, to the first mortgage itself, by which the company conveyed, in trust, all its line of road, then and thereafter to be constructed, and all of its property and franchises then possessed or thereafter to be acquired, and declaring on its face that it shall be a continuing lien to secure the full and final payment of all the bonds "which may be created, issued and negotiated under the security of the same, so that, however, the total amount so created, issued and negotiated shall not exceed $15,000 per mile of completed road, single track, whether now completed or hereafter completed, etc., * * * and * * * shall be for the benefit and security of and in trust for the holders of said bonds, without preference, priority or distinction as to lien or otherwise, of any over another, and so that each and all of the said bonds, to be issued as afore-said, shall have the same right, lien and privilege under and by the said mortgage, and shall be all equally secured thereby, with like effect as though they had all been made, executed, delivered and negotiated simultaneously on the date of the said mortgage, to secure the payment of the same." And in the respects just mentioned the general mortgage contains similar provisions, except that it was for $25,000 per mile, was expressly made subject to the first mortgage, and was for interest at the rate of six per cent. per annum instead of seven per cent., as in the first mortgage.

The first mortgage, then, authorized the issue of bonds to the amount of $15,000 per mile of completed single track. When the road was completed to Waynesboro, $2,270,000 of these bonds had been issued, that being the aggregate amount at the specified rate per mile to that point, and the railroad company was without authority to issue any more bonds under that mort-gage, except in the event of the extension of its road south from that point, in which event it had, as has been shown, express authority to continue to issue them at the same rate per mile of completed track. Soon after the completion of the road from

Hagerstown to Waynesboro, known as the northern division of the road, the company, casting about for an extension and more desirable connection further south, determined to extend its road and to connect with the Atlantic, Mississippi & Ohio, now the Norfolk & Western, and finally Big Lick, now Roanoke, was fixed on as the point of connection.

At a meeting of the stockholders of the railroad company, held on the 1st day of April, 1881, certain resolutions, as already stated, were passed relating to the construction of the extension of the road south from Waynesboro to Roanoke. By one of these resolutions the company's directors were " requested and advised to provide, at as early a day as in their judgment shall be prudent, for the execution and construction of such extension, and the completion and equipment of the railroad of this company ; and they are hereby authorized and empowered for the purpose, from time to time, to use and employ all the powers, resources and property of this company so far as in their opinion required ; .and to make and to authorize the making of such contracts as to them may be deemed advisable." And it was further resolved that, for the purpose of acquiring the means of retiring and cancelling the bonds which had been issued under the first mortgage, and also the bonds which had been issued under a second mortgage, dated April 2d, 1880, and for the purpose of increasing the facilities of the company for a speedy completion of the road, the board of directors should be, and they thereby were, authorized and empowered to execute a general mortgage, upon the security of which bonds might be issued, not to exceed $25,000 per mile then constructed or thereafter to be constructed. And the board of directors were authorized to make such contracts or agreements with the holders of bonds under the first and second mortgages as they might deem proper for the purpose of retiring and cancelling the same, and of obtaining a release of said mortgages. But with this proviso:

" *Provided, however,* In case the board of directors should, at any time before the satisfaction of the first mortgage of April

1st, 1880, deem it advisable to continue, or from time to time to make issue of bonds under and according to the said first mortgage of April 1st, 1880, they shall have full power and authority so to do ; but at all times there must be set apart and retained by the trustees of the general mortgage, out of the bonds authorized to be issued under the general mortgage, an amount equal to the bonds secured by the first mortgage of April 1st, 1880, then outstanding, for the purpose of retiring the same, unless such first mortgage bonds should come into the possession of the trustees of the general mortgage, it being intended that until all the bonds which have been, and may hereafter be, issued under the security of the first mortgage of April 1st, 1880, and second mortgage of April 2d, 1880, shall come into the hands of the trustees of the general mortgage, and such trustees should request and obtain the satisfaction of the first mortgage of April 1st, 1880, all the first mortgage bonds which may come into the hands of the trustees of the general mortgage shall be held by them uncancelled for the security and benefit of the general mortgage bondholders; it being understood, however, that the coupons of such first mortgage bonds shall be cancelled by the trustees of the general mortgage and surrendered to the company as they mature, provided that at such time the matured coupons upon such of the general mortgage bonds outstanding shall have been duly paid, but the bonds issued under the general mortgage for the purpose of retiring the bonds issued under the first mortgage of April 1st, 1880, may be exchanged for the said first mortgage bonds upon such terms as may be agreed upon, or sold for the purpose of providing the means to purchase or pay off the outstanding first mortgage bonds."

These resolutions having been adopted at the stockholders' meeting held on the 1st day of April, 1881, the board of directors of the company met on the 5th of April, 1881, and adopted resolutions approving the bonds and mortgage executed on that day in conformity therewith, the resolutions of the stockholders

aforesaid being made, *in totidem verbis,* part of the mortgage by way of recital.

In this authoritative action of the railroad company, we have not only the indisputable evidence of the power of the company to issue those bonds, and that they were issued in exact pursuance of the authority conferred, but of the company's embarrassed condition, and the absolute necessity of husbanding all its resources in order to secure the credit essential to the achievement of its then main object, which was to extend its road south to Roanoke.

It had been demonstrated that the road could not be constructed for $15,000 per mile.    It was, therefore, resolved to resort to a general mortgage on the whole line of road, not to exceed $25,000 per mile of completed road ; and the mortgage of April 5th, 1881, was the result.    In the execution of this mortgage it was not meant to execute a second or subsequent mortgage, but a general mortgage, as the instrument on its face purports to be.    The obvious purpose was to retire, either by exchange or purchase, all bonds under prior mortgages, so that eventually there would be but the one general mortgage, by which all the mortgage creditors would be secured and all would stand on the same footing, without any priority of lien or preference of one over another.    With these objects in view, and inspired with the hope of speedily extending and equipping its road, the stockholders, as we have seen, conferred upon the directors of the company authority " to use and employ all the powers, resources and property of this company, so far as in their opinion required, and to make, and to authorize the making of, such contracts as to them may be deemed advisable."    And to show that the company, in the event then determined upon of extending its road, recognized, as prominent among its resources thus dedicated, the right to continue to issue bonds under the first mortgage, at the specified rate of $15,000 per mile of completed road, the stockholders further authorize the directors, if they should find it necessary or expedient, to " continue from time to time to make

issue of bonds under and according to the terms of the said first
mortgage of April 1st, 1880."

But the railroad company, foreseeing that it might not succeed
in effecting an exchange of its general mortgage bonds for the
outstanding first mortgage bonds, and that it might in that
event be seriously embarrassed in its operations, determined,
prudently and wisely, to hedge about and carefully reserve and
protect its right to continue the issue of bonds under the first
mortgage of April 1st, 1880; and this was effected by the pro-
vision that, "until all bonds which have been, and may there-
after be, issued under the security of the first mortgage of April
1st, 1880, shall come into the hands of the trustee of this mort-
gage under this provision"—evidently meaning the provision
for the exchange of the general mortgage bonds for those of the
first mortgage—"and the trustees of this mortgage shall deter-
mine the advisability of the satisfaction and release of the said
first mortgage of April 1st, 1880, all such first mortgage bonds
which shall come into the hands of the trustee, under this pro-
vision, shall be held by the trustee uncancelled for the security
and benefit of the holders of bonds secured hereby; it being
understood, however, that the coupons of such first mortgage
bonds shall be cancelled by the trustee, and surrendered to the
party of the first part as they mature, provided that at such
time the matured coupons upon such of the bonds secured hereby
and outstanding shall have been duly paid; but when all such
first-mortgage bonds shall have been acquired by the party of
the second part, the said bonds shall then be cancelled by the
party of the second part, and the said mortgage shall be satis-
fied and released so soon thereafter as the same can be con-
veniently done."

On the 20th day of April, 1881, only fifteen days after the
general mortgage was executed, $1,545,000 of first-mortgage
bonds were, in pursuance of the prescribed terms, duly issued
by the railroad company and delivered by its treasurer to the
Fidelity Insurance, Trust and Safe Deposit Company, as trustee

in the first mortgage, so that they might be ready to be certified
by the trustee, and issued in pursuance of the terms of the
mortgage, upon the certificate of the engineer, approved by the
president of the railroad company, of the completion of addi-
tional miles of road.    The $1,545,000 of bonds were issued and
deposited under a mistaken under-estimate of the distance from
Waynesboro to Roanoke, the true amount actually issued being
$1,560,000, as explained in the statement of the case.

The issue of these bonds immediately after the execution of
the general mortgage, and in strict pursuance of the terms of
the first mortgage, again ·clearly evinces the purpose of the
directors of the railroad company to avail themselves of the
authority conferred by the aforesaid stockholders' resolution,
which was made part of the general mortgage, to issue and use
for the extension of the road south of Waynesboro all of the
first mortgage bonds; that is to say, to the amount of $15,000
per mile of road as it should be thereafter completed ; all the
bonds issued for the construction of the road north of Waynes-
boro, having, as already stated, been previously certified by the
trustee and delivered to the railroad company, and by it dis-
tributed to the parties entitled thereto.

At the meeting of the railroad company's board of directors,
held on the 5th of April, 1881, a special committee on construc-
tion had been appointed, and to that committee was referred
" all matters pertaining to the negotiation of the mortgage bonds
or other securities of the company, as may be considered neces-
sary or advisable by them, for the purpose of providing means
o pay for said construction," that is, of the road south of
Waynesboro.    And on the 5th of May, 1881, that committee
reported a plan, by means of which the amount necessary for
the construction, south of Waynesboro, could be obtained, and,
with the report, submitted a prospectus, dated June 30th, 1881,
and also the form of a subscription list for the approval of the
board.

In that prospectus, which, after its approval, as has been

shown, was issued in the form of a printed circular, it was stated that the general mortgage of $25,000 per mile over the entire length of the road, which it was then supposed would be two hundred and thirty-eight miles, amounting in the aggregate to $5,950,000, had been executed; and that of the amount secured thereby there would be retained in the hands of the trustees, to retire outstanding bonds upon the road already constructed $3,575,000, leaving $2,375,000, and that "these bonds, to the extent of the first mortgage bonds in the hands of the trustee of the general mortgage, will be entitled to part of the security of the first mortgage on the road, inasmuch as the $1,545,000 (erroneously stated in the circular at $1,436,000) bonds issued on the ninety-five and three-fourths miles of the extension, under the first mortgage of $15,000 per mile (which covers the entire line built and to be built), have been lodged with the trustee, as collateral on the general mortgage."

In the subscription form attached to said prospectus (the circular before referred to) it was stated that the subscriptions were made "upon the terms and conditions indicated in the above prospectus." This report was "approved and accepted" by the board of directors on the 9th of May, 1881. And at a special meeting of the finance committee, held on the 20th of May, 1881, the chairman reported, *inter alia,* that the entire amount, $2,375,000, of general mortgage bonds had been subscribed in accordance with the proposition contained in the circular, and that thereby a sufficient fund was provided for the extension of the road.

The evidence in the record conclusively establishes the fact—indeed there is no evidence to the contrary—that the general mortgage bonds, the bulk of which were purchased by a syndicate, were purchased not only by the syndicate, but by subsequent holders of them, or some of them, on the faith of this prospectus, or circular, and that one of the inducements to the purchase was the additional security for the payment of those obtained

by the deposit with the trustee of the general mortgage of the first mortgage bonds.

It is not perceived that the railroad company, in thus pledging these fifteen hundred and sixty first-mortgage bonds as security for the benefit of the general mortgage bondholders, did any injustice to or violated any contract right of the first mortgage bondholders. Acting under its charter, which authorized the extension of its road, the railroad company executed the first mortgage of April 1st, 1880, to secure its bonds to an extent not exceeding $15,000 per mile of road then or thereafter to be completed. The road has been extended and completed, and bonds at the rate of $15,000 per mile, and no more, have been issued under and in pursuance of the terms of the first mortgage, the $2,270,000 of bonds, held by the first mortgage bondholders, and the $1,560,000 of extension bonds issued thereunder and pledged for the security of the general mortgage bondholders, together make the aggregate of $3,830,000 at $15,000 per mile of the line of road actually constructed.

The proceeds of the bonds held by the first mortgage bondholders were expended entirely on the construction of that part of the road north of Waynesboro, not a dollar thereof having been expended south of that point; while the extension south from Waynesboro was built exclusively with funds derived under the general mortgage. Yet the first mortgage bondholders claim a lien over the entire line of road prior and superior to that of the general mortgage bondholders. The claim is preposterous. It is true that the general mortgage was made expressly subject to the first mortgage, but, be it observed, it is subject not to the rights of the present first mortgage bondholders merely, but to all the rights secured by the first mortgage, prominent among which is the right to issue and use the additional bonds here in controversy.

Both lots of bonds were issued in virtue of one and the same authority, under the same mortgage, about the same time, and

for the same purpose.   Hence the rights of the first mortgage bondholders, as respects the fifteen hundred and sixty extension bonds, are precisely the same as those of the general mortgage bondholders; the two stand together as first lienors.

Though these fifteen hundred and sixty first mortgage bonds issued and deposited as collateral for the general mortgage bonds be held to be valid securities under the general mortgage, and they certainly are such, how does that fact impair in any way the contract rights of the first mortgage bondholders?   Both lots of bonds were issued under and in exact pursuance of the first mortgage, and if one fails, the other must necessarily fail also—if one is not entitled to the footing of first lien, the other can have no claim to such a position.   Suppose the railroad company had issued those bonds and put them on the market for the purpose of securing funds with which to aid the construction of the extension of its road, and it undoubtedly had the right to do so, in what worse position would the first bondholders be placed than they are by the application of them as a strengthening plaster—as a first lien backing and support to the general mortgage bonds?   It is certain that they would be in the same relative position now held by them, and that is the position of their own choosing.

Nor is there anything in the objection that, if these fifteen hundred and sixty bonds be held to be valid, there has been an over-issue.   These bonds, deposited and held by the trustee of the general mortgage as collateral, are not outstanding obligations of the company in the hands of the public, but are pledged as collateral security—as backing and bracing for the general mortgage bonds that *are* outstanding in the hands of the public. And, for illustration, if the railroad company were to-day to pay off, at par, all its outstanding general mortgage bonds, it would at the same time redeem from pledge those bonds held as collateral.   It is, therefore, clear that there is nothing in the idea of over-issue from this standpoint.

But it is strenuously insisted that there is an over-issue, inas-

much as the bonds issued under the first and general mortgages are greatly in excess of the company's authorized capital stock. And it is insisted that the court below erred in not deciding that the charter of the Shenandoah Valley Railroad Company having ·been granted by the concurrent legislative action of the States of Virginia, West Virginia and Maryland, the corporation, in the exercise of its powers, was controlled and limited by the terms and provisions of the charter, and in the mode and manner prescribed, and subject to all the requirements and prohibitions contained in the public acts and laws of each of said States, etc., etc.

This exception is far too long and argumentative to be conveniently set out in full. It seems to proceed upon the idea : 1st. That the act of the railroad company in issuing and depositing these bonds disregarded and violated its charter, and that its act is, therefore, *ultra vires,* illegal and void. 2d. That the court erred in that it did not give full faith and credit to the public acts and laws of West Virginia prescribing that no corporation shall issue any stock or bonds except for money, labor, property and materials actually purchased, received and applied to the purposes for which such corporation was organized, and which also prohibit the fictitious increase of the capital stock and indebtedness of any such corporations, etc., etc. 3d. That the court below erred in not giving full faith and credit to the public acts and laws of the State of Maryland, which limit the powers of this railroad corporation to borrow money on the credit of the corporation, and to execute bonds therefor, and to pledge the property and income of such company to secure the payment thereof to an amount not exceeding its capital stock ; and it is said that this limitation is contained in the grant by said State to this railroad company. Thus there are several assignments of error under one head.

As to the first and second it is only necessary to say, in the light of what is disclosed by the record, they present nothing whatever for consideration; and as to the third it is founded in

an obvious mistake both as to fact and law. There is nothing of the kind in the grant or charter act of the State of Maryland.

This railroad company was incorporated by the Virginia legislature by an act dated February 23d, 1867, with an authorized capital stock of $4,000,000, but with the right to increase it from time to time, as before stated. The acts of the States of West Virginia and Maryland were simply conforming acts respectively. The West Virginia act was passed in February, 1870, and, after reciting the Virginia act, expressly grants "the same rights and privileges within the territory of West Virginia" that were granted by the Virginia act within the territory of that State. And the Maryland act, after reciting both the Virginia act and that of West Virginia, grants, within the territory of that State, the same rights and privileges granted by the acts of Virginia and West Virginia. Ten years thereafter (the Maryland act having been passed in April, 1870,) the Maryland legislature did pass an act, which seems to have been useless, simply authorizing this railroad company to borrow money to an amount not exceeding its *authorized* capital stock. But that act could not affect the chartered rights of the company, which is a Virginia corporation. But grant, for the sake of the argument, that the fifteen hundred and sixty bonds were issued and deposited in contravention of the terms, as claimed, of certain statutes of West Virginia and Maryland, yet the objection may be met by several very satisfactory answers.

In the first place, a railroad extending through two or more States, and incorporated by the laws of each, is not a joint corporation of the two States, but a *separate corporation in each State,* subject only to the laws of the State within the respective jurisdictions, however those laws may conflict as to the operation of the road. 1 Wood's R. R. Law, p. 33. This is the recognized doctrine of many courts of the highest authority, especially the supreme court of the United States.

In the case of *Ohio & Miss. R. R. Co.* v. *Wheeler,* 1 Black, 286, that court said, although the company was incorporated by

the States of Ohio and Indiana, and was spoken of in the laws of each State as one corporate body, exercising the same powers and fulfilling the same duties in both States. *Yet it has no legal existence in either State except by the laws of the State;* and neither State could confer upon it a corporate existence in the other, nor add to *or diminish the powers to be there exercised.*

If this be sound law, as undoubtedly it is, neither Maryland nor West Virginia could impose any restrictions or limitations upon the exercise of corporate powers in Virginia. Their statutes and laws could have no force in this State, nor can they impair the validity of any bonds issued under the authority of Virginia statutes. The bonds in question were issued in this State, in conformity with the charter granted by this State, and they are valid here and they are valid everywhere, and are now to be enforced by Virginia courts having complete jurisdiction of the subject.

If we look to the acts incorporating the Shenandoah Valley Railroad Company, it will be seen that the first and chief act was that of Virginia, and that the acts of West Virginia and Maryland simply conformed thereto, as already shown.

Here it may be added, that the objection made on behalf of the appellants to the validity of the claim of the general mortgage bondholders on the ground that, if the fifteen hundred and sixty first-mortgage bonds are held to be valid obligations of the company, bonds will, to that extent, have been issued in excess of the $25,000 per mile allowed by the mortgage, if true, is a matter in no way to the prejudice of the first mortgage bondholders. It is a matter with which they have no concern, for it is absolutely certain that bonds have not been issued under the first mortgage in excess of the $15,000 per mile allowed by that mortgage, and if not, the interests of the first mortgage bondholders cannot possibly be affected to their prejudice. And even had there been an excessive issue, which is not the case, the general mortgage bondholders alone could complain; for the limitation upon the issue in excess of $25,000 per mile was made

for their benefit, and for their benefit only, and they would have the right to waive the inhibition, and permit bonds to a greater amount to be issued, if they choose so to do.

But it is idle to contend that by holding the fifteen hundred and sixty first-mortgage bonds to be valid obligations of the company, and enforceable for the benefit of the general mortgage bondholders, the issue of bonds will be greater than that allowed by the general mortgage. For by the agreement under which the bonds in dispute were to be held as security for the general mortgage bondholders, the provision for the exchange of general for first mortgage bonds became to that extent imperative, and it would have been worse than idle for general mortgage bonds to be retained for the purpose of an exchange which never could be effected. It follows, therefore, that the issue of general mortgage bonds to the full amount for which they were issued, was entirely legal and proper.

Another objection made and most earnestly pressed is, that the fifteen hundred and sixty bonds are imperfect and void, because they have never been *certified* by the trustee. The all-sufficient answer is, that for the purpose of enforcing the lien of these bonds under the first mortgage, for the benefit of the general mortgage bondholders, it is not necessary that they should be certified; and were it necessary, a court of equity would without hesitation compel the trustee to certify them. It was his duty to do so, and his neglect, omission or refusal to perform that duty cannot, in equity, be permitted to defeat the rights of the general mortgage bondholders who were induced to believe, and had the right to believe, that these securities, upon the faith of which they parted with their money, were in all respects regular and complete. It is a maxim of universal application that "equity regards and treats that as done, which, in good conscience, ought to be done." This maxim is the source of a large part of that division of equity jurisprudence which concerns equitable property, and the doctrines and rules which create and define equitable estates or

interests are in great measure derived from its operation. The true meaning of this maxim is, that equity will treat the sub-ject-matter of a contract, as to collateral consequences and inci-dents, in the same manner as if the final acts contemplated by the parties had been executed exactly as they ought to have been, not as they might have been executed. 1st Pom. Eq. Jur. § 364, and note.

Perhaps no better illustration of the universality of the maxim can be found than is afforded in the case of *Frederick* v. *Frederick,* 1 P. Wms. 710. In that case a person had contracted to become a citizen of London, but died before he had carried this agreement into effect by taking up his freedom. His widow thereupon brought a suit to procure his personal estate to be dis-tributed in accordance with the customs of London, which ap-plied to citizens only, and which prescribed a very different mode of distribution from that which prevailed under the statute in other parts of England. The court, invoking the maxim, held that the deceased should be regarded as though he were actually a citizen at the time of his death. Ib. note 1. So, in the same note, the remark of Lord Chan. Westbury, in *Coventry* v. *Barclay,* 3 De G. J. & S. 320–328, is cited: "It is the rule of a court of equity to consider that as done which ought to be done; and if, therefore, I find that the accounts and valuation of July, 1860, at the making of which Mr. Bevan was not present, were afterwards accepted and agreed to by him, I shall hold that the account was in equity signed by him at the time when it was so accepted."

It may here be said, parenthetically, that, in the light of the equitable doctrine above stated, the provision, "and without such certificate said bonds shall not be valid or obligatory for any purpose whatever," can in no manner invalidate the bonds pledged as additional security for the benefit of the general mortgage bondholders.

But the doctrine under discussion rises to yet higher ground, and in a large class of cases deduces the obligations of a trust

from powers granted. In discussing the subject of "trusts that arise by construction from powers, it is said in 1 Perry on Trusts, § 248, that "in dealing with the cases that have arisen upon these enquiries, courts have distributed powers into *mere powers,* and powers *coupled with a trust. Mere powers* are purely discretionary with the donee; he may or may not exercise or execute them at his sole will and pleasure, and no court can compel or control his discretion, or exercise it in his stead and place if for any reason he leaves the power unexecuted. If the donee executes the powers, but executes them in a defective manner, courts may aid the execution and supply the defects, but they cannot exercise or execute mere naked powers conferred upon a donee. It is different with powers coupled with a trust, or powers which imply a trust. In this class of cases the power is so given that it is considered *a trust* for the benefit of other parties; and when the form of the gift is such that it can be construed to be a *trust,* the power becomes *imperative,* and must be executed. Courts will not allow a clear trust to fail for want of a trustee; nor will they allow a trust to fail by reason of any act or omission of the trustee; therefore, courts will not allow a trust to fail or to be defeated by the refusal or neglect of the trustee to execute a power, if such power is *so given* that it is *reasonably certain* that the donor *intended that it should be exercised."*

This doctrine, the soundness of which is beyond all question, so aptly applies to the case in hand as to leave no room for doubt that, if necessary, a court of equity would compel the trustee to certify the bonds in question, it being a duty expressly imposed by the terms of the trust.

We come now to the consideration of perhaps the most interesting question in the case. It is the objection that the sale of the $2,375,000 of general mortgage bonds was negotiated by the banking house of E. W. Clark & Co., the financial agents of the Shenandoah Valley Railroad Company, and were purchased or subscribed for by said banking-firm, or by members

thereof, standing in a fiduciary relation to said railroad company, which rendered the whole transaction invalid, and, therefore, rendered the deposit of the fifteen hundred and sixty bonds as collateral, also invalid.

The facts, as disclosed by the record, are these: The firm of E. W. Clark & Co. were, at the time of these transactions and long prior thereto, the recognized financial agents of the Shenandoah Valley Railroad Company, and two prominent members of said firm, Clarence H. Clark and F. J. Kimball, were also officers of said railroad company, the latter being its president, and the former one of its board of directors; that said banking firm, and especially said Clark and Kimball, members thereof, were not only the financial agents of this railroad company, but were its constant and indulgent friends in the period of its infancy, financial embarrassment and struggles for existence, and sustained its drooping credit by advancing to it, from time to time, large sums of money, the result of which was that the firm of E. W. Clark & Co. was forced into liquidation in the name of its successor, the present firm of Clark & Kimball, of which new firm Clarence H. Clark and F. J. Kimball are prominent members; that the firm of E. W. Clark & Co., before going into liquidation, did, as the financial agents of the railroad company, subscribe for the general mortgage bonds, or the bulk of them, some of them having been subscribed for by others, said subscription having been by E. W. Clark & Co., not for itself as a firm, but for a syndicate composed of members of the firm and others; that Clarence H. Clark and F. J. Kimball, members of said firm, became thus the individual owners, respectively, of very large numbers of said bonds, and that one of the inducements to such subscriptions was the agreement of the railroad company, put forth in its said prospectus, to pledge as collateral for the bonds so subscribed for, the fifteen hundred and sixty bonds in dispute; and that the price at which the general mortgage bonds were put upon the market was fixed not by E. W. Clark & Co., as financial agents, but was prescribed

by the railroad company itself, through its finance committee, in a resolution adopted thereby, at a special meeting of said committee, held at Philadelphia on the 20th of May, 1881, as follows:

" *Resolved,* That the general mortgage bonds of the company should be offered on the following terms: Each bond of $1,000 and five shares of stock for one thousand dollars ($1,000) in cash (less a commission of five per cent.), and accrued interest on bond," etc.

At the price thus prescribed by the railroad company, the general mortgage bonds were subscribed for and the amount so subscribed was paid to the railroad company in cash, and was actually expended in the construction of the extension of the railroad from Waynesboro to Roanoke.

In the light of these facts, which are clearly established, we discover not in the purchasers or holders of these fifteen hundred and sixty bonds the conduct of faithless trustees or agents, but that of generous, public-spirited friends and benefactors whose liberality contributed largely to the building of this important line of railroad.

It is not necessary to discriminate nicely as to who were the real purchasers of the general mortgage bonds; nor is it material whether they were so purchased by the firm of E. W. Clark & Co., or by a syndicate composed of members of that firm and others. Let it be conceded that they were purchased by said firm, at the time the financial agents of the railroad company, all that could be required is that their conduct was open and fair, and the transaction conducted in the utmost good faith.

It is not intended to deny or in any way question the rule that whether such an agent, be he the financial agent, as president or director of the railroad company, is, strictly speaking, to be called a trustee or not, for there can be no doubt that in either case the character is a fiduciary one, being intrusted by the company with powers to be exercised for the common and general interests of the corporation, and not for its or their or his private

interests, and that, whether the one or the other, the doctrine applies by which equity requires that confidence shall not be abused by the party in whom it is reposed, and which it enforces by imposing a disability, either partial or complete, upon the party intrusted to deal, on his own behalf, in respect to any matter involving such confidence.

The inhibitory principle announced, and universally applied under this rule, has no earthly application to the circumstances of the case in hand; for here no trust has been abused, and no advantage obtained by the trustee or agent. It will be found, on examination of the cases in which this salutary principle of equity has been applied, that they all proceed upon the idea either that the agent or trustee is so situated that he cannot make a contract, for his own benefit, with respect to the subject of the trust, or that he has gained some advantage in dealing therewith, which, in equity and good conscience, enures to the benefit of the *cestui que trust*.

The agent here, whether the firm of E. W. Clark & Co., the financial agents of the railroad company, or members of that firm composing a syndicate, or Clarence H. Clark, a director of the railroad company, or F. J. Kimball, its president, was guilty of no concealment, entered into no transaction bringing their duty as trustees or agents into conflict with their private interests; nor did they, as such trustees and agents, have in their custody any property to be sold by them in such fiduciary relation, nor did they gain any undue advantage over either the company or its creditors, or reap any profit by any transaction touching the company's property. On the contrary, they simply lent their money to the railroad company upon the terms prescribed by it, as any stranger might do, and took the security for the payment thereof pledged under the general mortgage, and against this there is no bar in either law or morals. It cannot be maintained that the rule in question, or any rule, forbids a dealing of this character—nor has any case gone to the unreasonable extent of so holding. See note to *Fox* v. *Marretta*, 1 Lea. Cas. Eq.

p. 237; *Twin Lick Oil Company* v. *Marbury,* 91 U. S. 587; *Hotel Company* v. *Wade,* 97 U. S. 75.

In the last named case it was said: But where stockholders sanction a contract under which directors loan money to the corporation, and its bonds, secured by mortgage, are given, if the money is properly applied, the corporation is estopped from setting up that the bonds and mortgage are void by reason of the trust relations which directors sustained to it. Here the railroad company not only obtained the loan on the terms dictated by it, but received the cash and actually expended it in the construction of the extension of its road. Could there be any higher sanction than this? We think not. It would be an almost barbarous rule that would forbid a transaction of this character, and one that would at least hazard the undoing of all the common transactions of mankind.

Even in the cases when the equitable principle in question is given its widest sweep, the general rule is that the contract may be avoided at the election of the stockholders, or *cestui que trust,* upon the terms of restoring what the trustee or agent has parted with in the transaction. The principle underlying this doctrine is forcibly stated by Finch, J., in *Duncomb* v. *N. Y., H. & N. R. R. Co.,* 84 N. Y. 190, where it is said: "Nor is it at all questioned that, in such cases, the right of the beneficiaries, or those claiming through him to avoidance, does not depend upon the question whether the trustee in fact has acted fraudulently or in good faith and honestly, but is founded upon the known weakness of human nature, and the peril of permitting any sort of collision between the personal interests of the individual and his duties as trustee in his fiduciary character. *Dovene* v. *Fanning,* 2 Johns. Ch. 260. But the rule was adopted to secure justice, not to work injustice; to prevent a wrong, not to substitute one wrong for another; and hence have arisen limitations upon its operation calculated to guard it against evil results as inequitable as those it was designed to prevent. Thus, the beneficiary may avoid the act of the trustee, but cannot do so

without restóring what it has received.   *York Co.* v. *McKenzie,*
8 B. Per. Cas.   To cling to the fruits of the trustee's dealing
while seeking to avoid his act; to take the benefit of his loan,
and yet avoid and reverse its security, would be grossly inequita-
ble and unjust.   It would turn a rule designed as a protection
into a weapon of offense and injustice."

Putting aside all mere verbiage about buying and selling
bonds, and looking at this transaction in its true light, it was
simply a lending of money on the one hand, and borrowing on
the other; and to secure the payment of the loan thus obtained,
the railroad company issued its bonds, secured under its general
mortgage of April 5th, 1881, by which it pledged all its line of
road as aforesaid, all its property, rights and franchises, and
pledged the fifteen hundred and sixty bonds as collateral for
said general mortgage bonds.   *Town of Danville* v. *Sutherlin,*
20 Gratt. 555.

The pledge was a valid one, whether made for a debt simul-
taneously contracted or for a pre-existing debt.   See *Duncomb* v.
*N. Y., H. & N. R. R. Co., supra;* Jones on Pledges, § 74; Jones
on Railroad Securities, § 209, and numerous cases cited.   In the
light of the authorities, there can be no doubt that the railroad
company had the perfect right to issue and pledge the fifteen
hundred and sixty bonds in dispute as collateral security for the
general mortgage bonds.

After a most laborious investigation of the case, as presented
by the record, we feel constrained to say, we discover nothing
in the least calculated to cast suspicion upon the actings and
doings of the Shenandoah Valley Railroad Company, or upon
the acts or conduct of its officers and agents who have testified
in this cause.   The conduct of all of them seems to have been
open and fair and above suspicion.   The same is true of the
officers and agents of the Fidelity Insurance, Trust and Safe
Deposit Company, notwithstanding the failure to certify, as
required, the fifteen hundred and sixty bonds in question, which
is explained with entire satisfaction by Mr. Grant, the vice-

Opinion.

president of the company, who also gave his deposition in the cause.

We are entirely satisfied that the decision of the circuit court was eminently proper, and the same must, as respects said fifteen hundred and sixty bonds, be affirmed.

HINTON, J., dissented.

DECREE AFFIRMED.