# CHARLESTON

## KELLY v. WELLSBURG ETC. CO. *et al.*

### AND

## ADAMSON AND MURDOCK v. WELLSBURG ETC. CO. *et al.*

Submitted February 25, 1914.   Decided April 14, 1914.

1. APPEAL AND ERROR—*Separate Suits—Single Appeal.*

   A single appeal may be taken from decrees in two separate suits substantially, though informally, prepared, submitted and heard as one, by agreement of the parties and consent of the court, express or implied.   (p. 131).

2. CORPORATIONS—*Mortgage Bonds—Issuance—Presumption.*

   All of a series of valid mortgage bonds, though issued at different times, are conclusively presumed to have been issued at the date of the recordation of the mortgage.   (p. 139).

3. SAME—*Bonds—Property Subject.*

   General creditors of a corporation issuing such bonds are conclusively presumed to have extended their credit on the faith of the corporate property subject to the mortgage, in so far as the bonds are issued for money for the corporate purposes.   (p. 139).

4. SAME—*Bonds—Priority.*

   Such bonds are entitled to preference, in the adjustment of the liens on the corporate property, over judgment, mechanics and other liens acquired before they were issued, but after the recordation of the mortgage.   (p. 140).

5. SAME—*Bonds—Fraud of Purchasers—Effect.*

   Fraud against the corporation issuing such bonds, in the acquisition or disposition of shares of its stock, by purchasers of the bonds in the course of their dealings or transactions in the stock, does not deprive them of the security afforded by the bonds.   (p. 138).

6. SAME—*Pledge of Bonds—Validity—Effect.*

   The pledge by such a corporation, of large amounts of such bonds, together with its unissued stock and the stock of the holding company, formed by it and others, and bonds of such holding company, secured by a collateral trust mortgage upon the stock and bonds of the constituent companies, through such holding company, to secure a comparatively small loan, is valid and amounts to an issuance of the bonds, making them a lien upon the property to the extent of the money advanced thereon for corporate purposes, notwithstanding lack of adequate consideration for the assignment of the stock and bonds of the constituent companies to the holding company and for the delivery of stock and bonds of the holding company to organizers

74 W. Va.

and promoters, and notwithstanding knowledge on the part of the pledgee of the existence of unsecured indebtedness of the constituent companies and frauds against the several corporations, committed by organizers, promoters and corporate officers in their transactions and dealings in the corporate stocks and bonds.    (p. 138·).

Appeal from Circuit Court, Brooke County.

Bill by John W. Kelly and others against the Wellsburg & Buffalo Valley Company, Wellsburg Coal Company and Wellsburg and State Line Railroad Company, and by Adamson and Murdock against the same defendants. Decrees for plaintiffs, and defendants appeal.

*Reversed and Remanded.*

*R. S. Nichols* and *T. S. Riley,* for appellants.

*James W. Ewing, J. B. Sommerville, John C. Palmer, Jr., F. A. Chapman, J. F. Cree,* and *Russell & Russell,* for appellees.

POFFENBARGER, JUDGE:

Upon an alleged irregulartity in this appeal, a motion to dismiss it is founded. The objection is that it seeks to bring up for review two separate and distinct causes. Its purpose is to reverse decrees in two suits, but they were, in substantial respects, heard together. Moreover, some of the issues made ran through both causes and the depositions applicable to both were taken and filed as in a single case. Separate orders of reference were originally made, but both causes were recommitted by a single one and, under the separate references, the commissioner made a single report. In several other instances, single orders and decrees were entered and always without objection by any of the parties. All of the heavy costs were made as if in a single suit and it was impossible to bring up the more voluminous and expensive parts of the record in one cause without bringing them up in the other.

The two records were inseparably tied together in the making thereof by the voluntary and mutual action of all the active parties to both. In view of this situation, all are clearly estopped to complain of the burden of the costs incident to an appeal in the two causes as if they were one, for it is obviously a result of their own conduct and agreements

express or implied. Though not formally brought on to be heard together in the trial court, nor in all respects so actually heard, they were so treated by the parties, their counsel and the court in many important respects and inseparably bound together in the procedure, wherefore there was a clear right to bring up the decrees and records in both by a single appeal and the motion to dismiss must be overruled.

The purposes of the suits were the enforcement of liens upon the property of two insolvent corporations organized by the same people and for the accomplishment of objects intimately related, one a mining company and the other a railroad company. The former was known as the Wellsburg Coal Company and the other as the Wellsburg and State Line Railroad Company. Against the coal company, Adamson and Murdock, partners, brought a suit to enforce a judgment lien and, against the railroad company, John W. Kelly instituted a suit to enforce a mechanics lien for work done on the railroad and materials furnished for its construction. Both were hopelessly involved financially and a great many other creditors became parties to the suits.

Some of them asserted claims arising out of a transaction between these two corporations and a third one organized under the laws of New Jersey, known as the Wellsburg and Buffalo Valley Company, which, it is claimed, took over nearly all the stock of the two original West Virginia companies and did take over nearly all of the bonds issued by them and executed thereon a collateral trust mortgage to secure a large issue of bonds of its own, in lieu of which it issued temporary certificates, known in the record as interim bonds. This mortgage covered generally certificates of stock and bonds of both of the original companies referred to in the record and briefs as the underlying companies.

Charters for these underlying companies were taken out in September, 1902, by Joseph A. West, Carl C. Law, L. F. Darrall, W. G. Wilkins, R. C. McLean and W. S. Huselton. How much of their capital stock was issued by these companies is a matter of controversy, but each of them seems to have had authority to issue 3,000 shares of the par value of $100.00, making $300,000.00. Both companies had the same individuals for stockholders and officers. At or about the

same time, these parties procured a charter under the laws
of Pennsylvania for a railroad from the terminus of the
Wellsburg and State Line road, at the State line, to Wash-
ington, Pa., contemplating a continuous line from Wells-
burg to Washington by means of two roads.  The coal com-
pany purchased and paid for about 1300 acres of land along
the line of the contemplated railroad, at a cost of about $30,-
000.00, and built a coal tipple at a cost of about $22,000.00,
and the railroad company acquired a right of way from the
Pennsylvania Railroad at Wellsburg to the State line between
West Virginia and Pennsylvania, and caused a portion of
its road to be built, at a cost of about $54,000.00, before its
financial difficulties began in the fall of 1903.

The money used in the acquisition of these properties and
the work done on them seems to have been derived princi-
pally from loans and credits extended and not from capital
contributed upon subscriptions to capital stock.  The Coal
Company executed to The Colonial Trust Company of Pitts-
burgh a deed of trust on its property to secure 250 bonds
issued by it, of the par value of $1000.00 each and amount-
ing in the aggregate to $250000.00, of which 147 were pledged
to a number of banks in Pittsburgh and vicinity, including the
Colonial Trust Company, as collateral security for loans,
amounting to about $98000.00.  At about the same time, the
railroad company executed a deed of trust on its property to
the Mercantile Title and Trust Company of Pittsburgh to
secure the payment of 300 bonds of the par value of $1000.00
each, amounting in the aggregate to $300000.00, 14 of which
seem to have been similarly used.  Most of the money used
by the railroad company was furnished by the Coal Com-
pany out of the funds raised by it in the manner indicated.

With the affairs of the two companies in this situation,
their managers including West, the president of each of
them, together with some of the secured creditors, entered
into arrangements and proceedings with New York parties
which culminated in the organization of the New Jersey cor-
poration, the Wellsburg and Buffalo Valley Company, the
execution of the collateral trust mortgage upon the stock and
bonds of the two underlying companies to secure an issue of
the bonds of the new company in the sum of $1,000,000.00, and

the procurement of a loan of $140,000.00 from the Knicker-bocker Trust Company of New York, secured by the deposit of said Valley Co. bonds of the par value of $800000.00, a portion of its stock of the par value of $700000.00, all of the stock of the Washington and State Line Railroad Company, all of the stock and bonds of the Wellsburg and State Line Railroad Company and all of the stock and 220 of the bonds of the Wellsburg Coal Company. This loan was further secured by the guaranty of 18 underwriters, binding themselves respectively to pay specific portions thereof, ranging from $5000.00 to $20000.00. The loan was evidenced by the promissory note of the Wellsburg and Buffalo Valley Company for $150000.00, but the Knickerbocker Trust Company, unwilling to loan, on the security offered, the entire amount, took it and endorsed a credit of $10000.00 on it, so as to make the actual loan $140000.00.

All this was done in pursuance of an agreement, dated, February 10, 1904, between Jos. A. West, Carl C. Law, Charles Kingsburg, W. S. Huselton, C. E. Bown and C. J. Coon of Pittsburgh, R. C. McLean of Oakmount, W. M. Judd of Wilkinsburg, H. M. Scott of Braddock and L. F. Darrall of Wellsburg, parties of the first part, and Lee S. Powell and Jas. R. Branch of New York, parties of the second part, reciting the ownership, by the parties of the first part, of all the capital stock of the three original companies, all the bonds of the Wellsburg and State Line Railroad Company and all but 30 of the bonds of the Wellsburg Coal Company, and the desire of the parties of the first part to become associated with the parties of the second part in the ownership of the stock and bonds of the three companies; and, as subsequently modified, providing for the execution of the scheme or plan of reorganization afterwards consummated in the manner stated. Out of the contemplated loan of $150000.00, Powell and Branch were to be paid $25000.00 for the expenses of organizing and promoting the new company. The agreement also provided for the payment to the Colonial Trust Company, out of said loan, of the $98000.00 for which 147 of the Coal Company bonds had been pledged. It contemplated an appropriation of $27000. for completion of the railroad from its Wellsburg terminus to the coal company tipple, the sur-

plus, if any, to be expended in the purchase of additional rights of way. Failure to obtain all of the contemplated loan and some other unanticipated circumstances necessitated modification of the agreed plan. The Trust Company charged a commission of $2200.00 and a trustee's fee of $500.00, and the loan fell short $10000.00. Accordingly the appropriation for railroad work was reduced to $13700.00. It required more money than was contemplated to pay loans for which bonds had been pledged. So Powell and Branch reduced their claim to $20000.00 and thus made possible an addition of $5000.00 to the $98000.00 provided for that purpose.

The agreement contemplated disposition among the parties thereto, of the stock and bonds of the new corporation, not used in the procurement of the loans. They found it necessary to deposit $800000.00 of its bonds and $700000.00 of its stock as collateral for the loan. The balance of the capital stock of the new company, $300000.00, was delivered to West and his associates, together with 170 of its bonds, and the remaining 30 bonds were held for exchange for 30 of the coal company bonds that had been sold outright, 15 to Mrs. Elizabeth Dohrman Thaw, 3 to Dr. James McMurray, 3 to Henry Tresise, 1 to C. E. Bown, 2 to H. M. Scott, 5 to Calvin Rodgers and 1 to C. C. Law.

In addition to the indebtedness of the coal company and railroad company, secured by their bonds, there were some unsecured debts, not provided for by the new holding corporation. W. E. Howley had a claim against the railroad company for construction work and Howley owed W. H. Cheeks, a sub-contractor, for work done on it by him. In September, 1903, Cheeks had sued Howley, and later filed a mechanics lien against the railroad company for $3917.79. Howley also sued the railroad company and, on July 10, 1905, obtained a judgment for $15000.00. There were numerous smaller claims which were reduced to judgments. The coal company also owed unsecured debts. Adamson and Murdock obtained a judgment against it, November 4, 1905, for $1525.35 and smaller claims of D. E. Hervey and J. C. Palmer were carried into judgments. Nor did the new company prevent the attachment of liens for work done on the railroad after it took charge of the properties. A contract

for railroad construction work was entered into with John W. Kelly, which consumed all ôf the $13700.00 appropriated for such work and then remained unsatisfied to the extent of about $8000.00 for which he filed a mechanics lien against the railroad.

These unhappy results are attributed by the New York parties to bad faith on the part of the Pittsburgh people, upon whom they say they relied to pay all unsecured creditors with funds derived from the stock and bonds of the new corporation delivered to them. Nothing in the contract of February, 10, 1904, nor the modification thereof made in June following obligated them to pay any debts, unless such an obligation arose out of their false representation as to liabilities in the schedule of debts annexed to it; and, instead of paying the corporate debts unprovided for in the transaction with the Knickerbocker Trust Co., they used the stock and bonds for private purposes.

Under these circumstances, the activity of the underlying Companies and the new one soon came to an end. Kelly brought a suit to enforce his mechanics lien and Adamson and Murdock another to enforce their judgment lien. The note of the new company for $150000.00 on which $140000.00 was due matured and was not paid. It was subsequently paid by some of the underwriters. Part of them were unable or refused to pay. Some paid only to the extent of their respective undertakings, and the others formed a committee through whom they paid the residue of the debt, the portions they severally undertook to pay augmented by the portions as to which there had been default.

In various ways, all the creditors of the several companies, the Colonial Trust Company and the Knickerbocker Trust Company and most of the parties who had had anything to do with the transaction in question, including the paying underwriters, became parties to the suits, and the controverted questions were whether the holders of the interim certificates of the Wellsburg and Buffalo Valley Company, secured by the mortgage upon stocks and bonds of the underlying companies, had any liens, if so, whether such liens were prior to the mechanics and judgment liens and whether the underwriters were entitled to prior liens by way of subrogation to the

extent of the $98000.00 of the secured debts paid out of the New York loan which they paid as guarantors and the $13700.00 paid out of that loan for construction work on the railroad. On the theory of fraud in the transactions through which the interim certificate holders and underwriters derived their alleged rights, the transfer of the stock and bonds of the underlying corporations to the holding company, the issuance thereon of the collateral trust mortgage bonds and the pledge of all the bonds to the Knickerbocker Trust Company, the trial court denied them the status of lienors and decreed sales of the properties to satisfy the liens of other parties.

Against the railroad company, the liens adjudicated, with their priorities, were as follows: (1) John W. Kelly, mechanics lien, $11,805.32; (2) Trimble'and Miller, mechanics lien, $808.92; (3) W. E. Howley, judgment lien, $21077.50, a large portion of which was ordered to be paid to his creditors; (4) John J. Coniff and John P. Arbenz, judgment lien, $2672.42; (5) D. E. Hervey, judgment lien, $58.49; (6) J. C. Palmer Jr., judgment lien, $437.98; (7) Frank E. Smith, judgment lien, $337.40; (8) Rural Valley National Bank, judgment lien, $2175.45; and Punxsutawny National Bank, judgment lien, $676.16; (9) W. McLain, [judgment lien, $158.26; making a total of more than $40000.00, including interest. Against the Coal Company, the liens as fixed by the decree, with their order of preference, are as follows: (1) C. E. Bown, bond and interest, $1437.00; H. H. Scott, bond and interest, 2874.00; Henry Tresise, bonds and interest, $4254.00; James McMurray, bonds and interest, $4311.00; Eliza D. Thaw, bonds and interest, $21,555.00; Calvin Rodgers, bonds and interest, $7,185.00; and James R. Branch, interest coupons, $870.00; (2) Adamson and Murdock, judgment lien, 2138.72; (3) Wellsburg National Bank, judgment lien, $2893.89; (4) Wellsburg National Bank, judgment lien, $7202.54; (5) James Howley, judgment lien, $372.52; (6) A. E. Anderson, judgment lien, $6351.30; (7) Logansport Coal Co., judgment lien, $2644.77; Keystone National Bank, judgment lien, $3331.44 and W. G. Wilkins, judgment lien, $13,038.15, making a total of more than $75000.00.

Notwithstanding the underwriters indirectly paid the $98000.00 for which bonds of the coal company had been

pledged before any of the mechanics or judgment liens had been acquired and the money paid Kelly on account of his work, they were denied right of subrogation on the ground of their alleged fraud in the transactions mentioned.

The charge of fraud is founded largely upon the knowledge of unsecured indebtedness by some of the parties to the New York transaction, their gross misrepresentations as to the value of the properties, their knowledge of the meagerness of the value of the stocks and bonds used as the basis of the organization of the holding company, non-issuance of, and non-payment of anything for, the stock of the underlying companies, access of all the participants in the New York transaction to the books and papers of the companies with enough knowledge of actual conditions to put them upon inquiry, the effort on the part of all to foist upon the public issues of stocks and bonds in excess of $3000000.00 representing values estimated at $400000.00 with their knowledge of actual values less than half of that sum and their appropriation and division among themselves of large amounts of the stocks and bonds for which they paid nothing. Other similar evidence is invoked to sustain the preclusion of the claims of the underwriters on the ground of fraud, but enough has been stated to show its character.

The subjects of all the transactions complained of were the stocks and bonds of the underlying companies. The properties of the companies and the debts of their unsecured creditors were indirectly and incidentally affected, but they were not the things actually handled and dealt with. No new lien was placed on any of the properties by the New York transactions, nor did they involve any fraudulent purchase of any of them.

No transfer, gift or fraudulent disposition of the stocks involved anything to which any creditor could resort for satisfaction of his claim or created any fraudulent charge on the properties of the companies. Claims of creditors, secured or unsecured, have precedence over the stock in the liquidation of the affairs of the companies and distribution of their assets. An unsecured debt is a means by which a lien on the property of the corporation may be obtained, superior to the rights of stockholders. Obviously, therefore, no manipu-

lation of the stock issued or unissued amounted to a fraudulent purchase of the assets of the corporations or any fraudulent charge thereon as against creditors.

The bonds involved in the transactions complained of were liens upon the properties under mortgages validly executed and admittedly prior in date to any of the liens to which the court gave preference by its decree, but, at the time of the New York deal, only 29 of the coal company bonds had been actually sold and 147 of them and 14 of the railroad company bonds pledged for debts. Under the impression that 30, instead of 29 of the coal company bonds, had been sold, the managers took up the 147 and the 14 and repledged them, together with $800000.00 of the bonds of the new company and caused to be held in trust 30 of the new company bonds for exchange for the supposed outstanding 30 of the coal company bonds. The repledging of the coal and railroad company bonds occurred after some of the debts for which judgments were subsequently obtained and mechanics liens filed had been incurred. This relation in time, hastily considered, lends color to a claim of fraud upon the creditors, but, if the bonds so pledged are limited in their extent, as liens, to the money actually furnished upon them for legitimate corporate purposes, there is no foundation for such charge. Notice to the pledgees of the bonds of the existence of unsecured debts or liens subsequent to the mortgage securing the pledged bonds signifies nothing. The recorded mortgage was constructive notice to general creditors of the lien it created. The bonds were issued under it for corporate purposes and upon them any person had the right to furnish money for such purposes at any time before their maturity or dishonor. Bonds secured by a first mortgage, though issued after a second one, are entitled to preference. *Baxter* v. *Washburn*, 76 Tenn. 1; *Hunt* v. *Gas Light Co.*, 95 Tenn. 136; *Atwood* v. *Shanadoah Val. R. Co.*, 85 Va. 966; Jones Cor. Bonds, sec. 182. The dates of the issuance of bonds secured by a mortgage are immaterial. All of the series stand upon the same footing. They are conclusively presumed to have been issued on the date of the recordation of the mortgage. *Broomall* v. *Steel Co.* 70 W. Va. 591; *Pittsburgh etc. Co.* v. *Lynde*, 55 O. St. 23; Jones, Cor. Bonds, sec. 215. General creditors of a corpora-

tion, whose credits were extended after the execution and recordation of a mortgage upon its property to secure a series of bonds, are deemed, in controversies between them and bona fide holders of the bonds for value, to have extended their credit upon the faith of the corporate property subject to the mortgage. *Reed's Appeal,* 122 Pa. St. 565; *Fidelity etc. Co.* v. *West Penn. etc. R. Co.,* 138 Pa. St. 494. Bonds pledged for loans are bonds issued, but the holders are admitted as creditors on the basis of the amount loaned on them, not their face value. *Broomall* v. *Steel Co.,* cited; Jones, Cor. Bonds, sec. 181.

Manifestly the Knickerbocker Trust Company was a holder of the bonds for value to the extent of the money furnished on the faith of them for the purposes of the underlying corporations and the underwriters as guarantors acquired the right of the company in them by their payment of the debt for which they were pledged. Neither execution nor recordation of the mortgages is denied. Through corporate agencies, the bonds came into the hands of the trust company for value, even though the holding company paid nothing for them. Though not a holder for value, it was an instrumentality used in the issuance of the bonds. Neither the trust company nor the underwriters became purchasers or owners of any of the bonds in the ordinary sense of the term, so as to entitle them to share in the proceeds of the property on the basis of their face value, but, as pledgees, they acquired the protection thereof to the extent, of the money they advanced for the corporate purposes or paid for the use and benefit of the corporations. "A corporation may pledge its bonds as collateral security and may deliver them to an agent for such purpose." *Broomall* v. *Steel Co.* cited; Jones, Col. Secur. sec. 70; Jones, Cor. Bonds, sec. 181. But pledgees are not entitled to assert them for their face value. Jones, Cor. Bonds, sec. 181.

That the note evidencing the debt for the payment of which the bonds were pledged was that of the holding company and not the note of either of the underlying corporations is immaterial. Equity looks to the substance, not the form, of the transaction. The underlying corporations got the benefit of the bulk of the money and the pledgee did not loan it merely on the note and bonds of the holding company. It took the

bonds of the original corporations, and, those of the holding company being utterly worthless, it could avail itself of the security of the bonds of the constituent companies. The other securities being worthless, their existence afforded no basis of equitable interference at the instance of other creditors, having only a single security.

This conclusion necessitates the adoption of an entirely new basis for the decree. How much of the $140000.00 was used to pay debts of the companies for which bonds had been previously pledged; what portion thereof was actually expended in construction work done by Kelly; how much of the money received by Powell and Branch may be treated as having been expended for corporate purposes of the underlying companies; and whether the money allowed the Knickerbocker Trust Company for commissions and a trustee fee can be so treated; are matters that must be ascertained and determined for the purposes of proper decrees and, as to them, there has been no inquiry by the commissioner or the trial court. Hence the causes must be remanded with directions to recommit them to a commissioner for an inquiry, upon the principles here stated, as to the amounts of the liens to which the underwriters are entitled, which, when ascertained, will be of equal dignity with those of the holders of the 29 coal company bonds actually sold, in so far as they relate to the coal company property, and the first lien thereon, and the first lien on the railroad company property, in so far as they are liens thereon.

Of course the interim bonds of the holding company, acquired by stockholders, promoters, organizers and others, without consideration, are not liens. If, however, any of such bonds or certificates were pledged or sold for money used for the purposes of the underlying companies, those who so acquired them, or their assignees, will be entitled to liens for such money, equal in dignity with other liens founded on the bonds, for the interim bonds are based on the bonds of the constitutent companies.

In so far as money acquired on the faith of the bonds was devoted to purposes of the separate companies, it must be decreed against their separate properties; and, if any proper expenditure shall be found to have been made in common for

purposes of both constituent companies, it will have to be apportioned between their properties in the adjustment of the liens.

For the reasons here stated, the decrees complained of will be reversed and the causes remanded.

*Reversed and Remanded.*